UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MATTHEW JACKSON,

Plaintiff,

v.

UDR, INC.,

Defendant.

Civil Action No. 26-351 (JEB)

MEMORANDUM OPINION

According to the leasing website, an apartment in Capitol View on 14th — a residential building here in Washington — comes with quartz countertops, triple-sliding glass doors, and a walk-in closet.  According to former resident Matthew Jackson, it also comes with a slew of illegal fees.  He originally brought this putative class-action suit against his former landlord and building-management company UDR, Inc., in D.C. Superior Court, arguing that the company's practices of (1) charging a $250 pre-lease Holding Deposit and (2) including a $1250 Lease Transfer Fee in rental agreements are unlawful under the D.C. Consumer Protection Procedures Act.  After removing the case to federal court, UDR now moves to dismiss, contending that Jackson lacks standing to bring his claims.  The Court agrees.  Instead of dismissing, however, it will remand the case to Superior Court as required by statute and deny Defendant's Motion to Dismiss as moot.

I.     Background

The Court, as it must at this juncture, draws the following facts from the Complaint. Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  It also considers

1

"documents upon which the plaintiff's complaint necessarily relies, even if the document is produced by a defendant in a motion to dismiss." Ward v. D.C. Dep't of Youth Rehab. Servs., 768 F. Supp. 2d 117, 119 (D.D.C. 2011) (cleaned up).

On January 10, 2025, Jackson submitted a rental application to Capitol View on 14th Apartments, a housing complex that promises "luxury DC apartments in the U Street Corridor." ECF No. 1-1 (Compl.), ¶¶ 1, 7; Capitol View on 14th, https://perma.cc/MY2T-MKTR.  The building is managed by UDR, which runs a slate of similar high rises around the District and employs uniform leasing processes at each location.  See Compl., ¶¶ 1, 6.  As part of his application, Jackson was required to pay a $50 "Application Fee" as well as a $250 "Holding Deposit."  Id., ¶ 11.  While the Application Fee became nonrefundable as soon as it was paid, the fate of the Holding Deposit depended on the outcome of the application.  See ECF No. 10-3 (Application Terms & Conditions) at ECF p. 2.  If the application was not approved, the Holding Deposit would be refunded.  Id.  If it was approved and the tenant then signed a lease, the Holding Deposit would be credited towards the required security deposit.  Id.  And if the applicant chose not to move forward with an approved application, UDR reserved the right to keep the Holding Deposit as "liquidated damages."  Id.

Jackson's application was accepted.  He then signed his lease on January 11, and UDR credited his Holding Deposit toward his security deposit.  See Compl., Exh. A (Lease) at 1.  Among many other terms, the agreement stated that if he sought to sublet or transfer his lease, Jackson would be charged a "Transfer fee" of $1250.  Id. at 8; Compl., ¶ 1.  A different provision of the lease inconsistently stated that in the event of an approved transfer, a "reletting fee will not be due."  Lease at 5.  The Complaint does not allege that Jackson ever sought to transfer his lease or that he was ever charged such a fee.

2

A few days before his one-year anniversary in the building, and in the midst of his 15-month lease, see Lease at 1, Jackson brought this class-action lawsuit against UDR in D.C. Superior Court. The Complaint alleged that UDR's practices of charging a Holding Deposit at the application stage (Holding Deposit Subcount) and of including a $1250 Transfer Fee in the lease (Transfer Fee Subcount) are both unlawful under the CPPA. See Compl., ¶ 41. For the Holding Deposit Subcount, Jackson contended that the District's Rental Housing Act defines an application fee as all fees charged prior to the lease signing and limits that amount to $52. Id., ¶ 14; see also D.C. Code § 42-3501.03(2A) (defining application fee). Because the Holding Deposit was charged before the lease was signed, Jackson reasoned, it constituted part of the application fee, and the total application fee of $300 thus exceeded the statutory cap. See Compl., ¶¶ 11–12. As for the Transfer Fee Subcount, Jackson pointed to a provision in the RHA limiting such charges to $53, a number dwarfed many times over by UDR's $1250. Id., ¶¶ 23–24. Jackson's proposed classes map straightforwardly onto these subcounts: one class of plaintiffs who paid the Holding Deposit and one class of plaintiffs who signed leases including the Lease Transfer Fee term. Id., ¶ 28.

Citing the Class Action Fairness Act, UDR then removed the case here to federal court. See ECF No. 1 (Not. of Removal), ¶ 5. It now moves to dismiss, contending primarily that Jackson lacks standing as to both subcounts. See ECF No. 10-1 (MTD) at 1–2, 7, 9–17.

## II.    Legal Standard

When a defendant files a Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction, the plaintiff generally "bears the burden of establishing jurisdiction by a preponderance of the evidence." Bagherian v. Pompeo, 442 F. Supp. 3d 87, 91–92 (D.D.C. 2020) (quoting Didban v. Pompeo, 435 F. Supp. 3d 168, 172–73 (D.D.C. 2020)); see Lujan v.

<u>Defs. of Wildlife</u>, 504 U.S. 555, 561 (1992).  In evaluating motions to dismiss, a court "assume[s] the truth of all material factual allegations in the complaint and 'construe[s] the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" <u>Am. Nat'l Ins. Co. v. FDIC</u>, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting <u>Thomas v. Principi</u>, 394 F.3d 970, 972 (D.C. Cir. 2005)).

## III.    Analysis

The Court first reviews Jackson's standing; finding it lacking, the Court next considers whether remand or dismissal is the appropriate resolution.

### A.      <u>Standing</u>

Article III of the Constitution limits the jurisdiction of the federal courts to resolving "Cases" or "Controversies."  U.S. Const. art. III, § 2, cl. 1.  A party's standing — that is, his "personal stake in the case," <u>TransUnion LLC v. Ramirez</u>, 594 U.S. 413, 423 (2021) (cleaned up) — "is an essential and unchanging part of the case-or-controversy requirement of Article III." <u>Lujan</u>, 504 U.S. at 560.  To have standing, a party must show that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 338 (2016).  A "deficiency on any one of the three prongs suffices to defeat standing." <u>US Ecology, Inc. v. U.S. Dep't of Interior</u>, 231 F.3d 20, 24 (D.C. Cir. 2000).  As "standing is not dispensed in gross," plaintiffs must establish their standing as to each claim brought. <u>DaimlerChrysler Corp. v. Cuno</u>, 547 U.S. 332, 353 (2006) (quoting <u>Lewis v. Casey</u>, 518 U.S. 343, 358 n.6 (1996)).

UDR devotes its standing arguments entirely to the first prong, contending that Jackson has not met the constitutional minimum in his alleged injury for either subcount. <u>See</u> MTD at 1–2, 9–13.  The Court likewise focuses its attention there.

4

Courts define an injury-in-fact as "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 578 U.S. at 339 (quoting Lujan, 504 U.S. at 560). For example, a broken leg or a totaled car undoubtedly would suffice. In contrast, the "violation of some abstract legal right without real-world effect on the plaintiff," Cherokee Nation v. U.S. Dep't of the Interior, 643 F. Supp. 3d 90, 106 (D.D.C. 2022), cannot create an injury sufficient for standing purposes. TransUnion, 594 U.S. at 426. In determining what constitutes a concrete injury, courts often consider "whether the alleged injury . . . has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." Id. at 424 (quoting Spokeo, 578 U.S. at 341).

At the motion-to-dismiss stage, the question is not whether plaintiffs have proved their injuries, but rather whether they have "sufficiently pled claims" of injury in their complaints. Jerome Stevens Pharms., Inc. v. Food & Drug Admin., 402 F.3d 1249, 1253 (D.C. Cir. 2005). "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice" for now because courts "presume that general allegations embrace those specific facts that are necessary to support the claim." Lujan, 504 U.S. at 561 (cleaned up). In the class-action context, named plaintiffs must "show that they personally have been injured." Warth v. Seldin, 422 U.S. 490, 502 (1975).

The Court will examine Jackson's various theories of injury in turn.

### 1.    *Holding Deposit Subcount*

After Jackson signed his lease, the $250 Holding Deposit he paid was converted into part of his security deposit, which everyone agrees was a lawful charge. See Lease at 1; Compl., ¶¶ 12–15; MTD at 10–11. UDR maintains that because the Deposit was ultimately credited toward a different, lawful bill, Jackson suffered no financial loss — and thus no injury — from

being charged.  See MTD at 10–11.  Put another way, UDR's collecting of the Deposit did not cause Jackson to wrongfully lose $250 because he would have had to pay that amount for the security deposit anyway.

Jackson ultimately concedes this point in his briefing.  See ECF No. 14 (Opp.) at 8.  He suggests, however, that because the $250 was collected on January 10 and he signed the lease the next day, see Compl., ¶¶ 7–8, 11, that one-day-early deprivation of money itself constitutes an injury.  See Opp. at 7–8.  The D.C. Circuit has, in the damages context, acknowledged that money has time value; a delay in the return of owed money (or, in this case, an early payment) can thus constitute an "actual, tangible" injury.  In re OPM Data Sec. Breach Litig., 928 F.3d 42, 66 (D.C. Cir. 2019).  The question here is whether the Complaint has sufficiently alleged such a theory of injury when that pleading makes no mention of time value.

Appellate courts in other circuits and courts in this district have split on what constitutes sufficient pleading of a time-value injury.  The Eleventh Circuit and some courts in this district have required plaintiffs alleging such injury to specifically state what they would have done with the money such that the inability to use it for the time period caused an injury.  Taylor v. Fed. Aviation Admin., 2019 WL 3767512, at *3 (D.D.C. Aug. 9, 2019) ("[I]t is incumbent on the plaintiff to plead how the lost use of money resulted in actual harm."); Kawa Orthodontics, LLP v. Sec'y, U.S. Dep't of the Treasury, 773 F.3d 243, 246 (11th Cir. 2014) (declining to recognize time-value injury where complaint "does not mention the word 'interest,' let alone allege that [plaintiff] had specific plans to invest its money into an interest-bearing asset").  On the other hand, the Ninth Circuit and other D.D.C. courts have treated time value as an inherent injury.  In their view, if money has such value, then a delayed return of money (or a forced early payment) is facially an injury and there is no need for additional specific pleading.  Buckner v. CONSOL

6

Energy Inc., 2024 WL 2382941, at *7 (D.D.C. May 23, 2024) ("Plaintiffs have alleged that Defendants' failure to pay the premiums will cause them injury, and that is sufficient [to plead a time-value injury].''); Van v. LLR, Inc., 962 F.3d 1160, 1165 (9th Cir. 2020) (explaining that plaintiff's injury is loss of "the use of her money," and complaint need not mention investment interest, as that "is simply a way of measuring and remedying [plaintiff's] injury, not the injury itself").

The Court reconciles the conflict using its (limited?) common sense: in situations where the time-value injury is obvious, such as cases involving a long delay or a plaintiff who plainly lost an opportunity related to the money, specific pleadings about the precise damage caused by loss of use may be less important. But in cases like this one, where the alleged deprivation lasted just a single day, harm begins to look implausible without more detailed pleadings to nudge the time-value injury into believability. For instance, one common quantification of this kind of injury is investment interest. $250 invested at 5% annually would yield just three cents in one day — assuming the market was even open on that day. If that is the basis of Plaintiff's injury, he needed to say so. The Court is disinclined to assume such loss on his behalf.

On this front, Jackson falls short. The Complaint makes no mention of time value or even of the payment being early; instead, it states only that Jackson was "injured by paying rental application fees exceeding the District's application fee cap." Compl., ¶ 21. Although Plaintiff's briefing briefly mentions time value, see Opp. at 8, "a plaintiff's standing to pursue a claim rests on the theory of injury presented in the complaint." Haase v. Sessions, 835 F.2d 902, 907 (D.C. Cir. 1987) (emphasis added). This dooms Plaintiff's first subcount.

Finally, Jackson claims that, financial loss aside, the overcharge is an injury akin to those that animated suits for conversion at common law, rendering his harm concrete under

TransUnion's historical-analog test. See Opp. at 8–9; TransUnion, 594 U.S. at 425 (accepting as sufficiently concrete "harms traditionally recognized as providing a basis for lawsuits in American courts"). That analogy is inapt. "Conversion has generally been defined as any unlawful exercise of ownership, dominion or control over the personal property of another in denial or repudiation of his rights thereto." Duggan v. Keto, 554 A.2d 1126, 1137 (D.C. 1989) (internal quotation marks and citation omitted). This tort is concerned principally with false acts of ownership taken while the rightful owner protests. Accordingly, where a "plaintiff concedes that he voluntarily transferred ownership, there is no unlawful exercise of control over plaintiff's property." Gharib v. Wolf, 518 F. Supp. 2d 50, 56 (D.D.C. 2007) (citing Equity Grp., Ltd. v. Painewebber Inc., 839 F. Supp. 930, 933 (D.D.C. 1993)). Here, Jackson paid the deposit to UDR. Whatever issues exist with UDR's requesting the money, there can be no trampling on Jackson's property rights after he willingly relinquished ownership and UDR became the true owner of the funds.

Seeing as every hallway has led to a dead end on the question of injury, this Court will accordingly direct the Holding Deposit Subcount to the exit.

### 2.    *Transfer Fee Subcount*

Jackson's second subcount faces a similar fate. UDR points out that Plaintiff never paid the Transfer Fee, nor was he ever charged it, and the Complaint does not allege that he was even interested in transferring his lease in the first place. See MTD at 13. Jackson instead takes a different tack, contending that the "inclusion of an illegal lease term" in the agreement was itself injurious. See Compl., ¶ 26. Drawing again on TransUnion's historical-analog test, he likens his injury to a "contractual injur[y]" resulting from UDR's interfering with his "rights pursuant to a contract." Opp. at 11.

8

An undesirable contract provision is not a contractual injury.  Jackson might not like what he has agreed to, but the Transfer Fee's existence standing alone does not harm him.  His argument that the fee provision is illegal looks more like a defense that a defendant may raise to avoid liability in a breach-of-contract suit.  Steiner v. Am. Friends of Lubavitch (Chabad), 177 A.3d 1246, 1255 (D.C. 2018) (explaining that "fraud in the inducement [is a] ground[] for rescission and may be used as a defense to a breach of contract suit"); HVAC Specialist, Inc. v. Dominion Mech. Contractors, Inc., 201 A.3d 1205, 1211 (D.C. 2019) (explaining public policy as contract defense).  Those defenses are not bases for suit themselves.  Contract law therefore provides little assistance to Plaintiff's efforts to establish an injury-in-fact through common-law analogs.  As Jackson puts forth no other theory of harm, this subcount too must fail for lack of standing.

Finally, Plaintiff asks that the Court permit him to amend his Complaint and add factual allegations to his Transfer Fee Subcount that might remedy these shortcomings.  See Opp. at 14. "It is axiomatic," however, "that a complaint may not be amended by the briefs in opposition to a motion to dismiss."  Richardson v. Cap. One, N.A., 839 F. Supp. 2d 197, 203 (D.D.C. 2012) (quoting Coleman v. Pension Benefit Guar. Corp., 94 F. Supp. 2d 18, 24 n.8 (D.D.C. 2000)).  As it stands now, the Complaint does not assert that Jackson was ever affected by the Transfer Fee, financially or otherwise, or was even at imminent risk of being so affected.  The Court thus cannot find an adequate injury.

B.      Remand

Having concluded that this suit cannot be housed in federal court, the Court must now determine its next steps.  Plaintiff suggests that the Court must send the case back to the D.C. Superior Court, see Opp. at 15, while UDR pushes for dismissal.  See ECF No. 17 (Reply) at 14.

When a federal court "lacks subject matter jurisdiction" over a removed case, "the case shall be remanded."  28 U.S.C. § 1447.  The plain text of the statute is unambiguous: remand is required.  Republic of Venezuela v. Philip Morris Inc., 287 F.3d 192, 196 (D.C. Cir. 2002) ("When it appears that a district court lacks subject matter jurisdiction over a case that has been removed from a state court, the district court must remand the case . . . ."); Travelers United, Inc. v. Hyatt Hotels Corp., 761 F. Supp. 3d 97, 109 (D.D.C. 2025) (same).

UDR protests that remand would be pointless — the D.C. courts also adhere to Article III requirements for standing, which means that the case will likely also be dismissed there.  See Reply at 14; Grayson v. AT&T Corp., 15 A.3d 219, 224 (D.C. 2011) ("[T]his court has followed consistently the constitutional standing requirement embodied in Article III.").  Perhaps, but the removal statute does not include a futility exception to § 1447's command of remand, nor has the Supreme Court or D.C. Circuit ever recognized one.  Ctr. For Sci. In The Pub. Int. v. Burger King Corp., 534 F. Supp. 2d 141, 144 & n.1 (D.D.C. 2008) (remanding case to Superior Court for lack of standing and declining to apply futility exception when none existed in Circuit); Sibley v. Alexander, 916 F. Supp. 2d 58, 63–64 (D.D.C. 2013) (same).  If the ping-ponging of this case between local and federal court strikes Defendant as wasteful, the Court notes only that UDR itself started the game.  Hettinger v. Bozzuto Mgmt. Co., 2025 WL 2029747, at *12 (D.D.C. July 21, 2025) (discussing defendant's "dubious strategy" of removing case before arguing dismissal for lack of standing).  In any event, given that Jackson has expressed interest in amending his Complaint, this Court will not attempt to predict how the case may unfold back in Superior Court.  Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund, 500 U.S. 72, 89 (1991) ("declin[ing] to speculate" on whether remand would be futile under § 1447).  It will therefore send this case back to its former home in the local courts.

## IV.      Conclusion

For the foregoing reasons, the Court will remand the case to D.C. Superior Court for lack of subject-matter jurisdiction and deny Defendant's Motion to Dismiss as moot.  A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date:  July 15, 2026